UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:12CR00344 ERW |
| | ) | |
| RONNIE WHISENTON | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

This matter comes before the Court on the Report and Recommendation of United States

Magistrate Judge Terry I. Adelman [ECF No. 59], recommending the denial of Defendant Ronnie

Whisenton's ("Defendant") Motion to Suppress Evidence and Statement [ECF No. 22]. On

September 13, 2012, the Government filed a one-count indictment, alleging Defendant violated 21

U.S.C. § 846(a)(1), by knowingly and willfully conspiring, combining, confederating and agreeing

with Adrian Bollinger and others, to distribute a mixture or substance containing a detectable

amount of marijuana [ECF No. 1]. Thereafter, Defendant filed his Motion to Suppress Evidence

and Statements, moving the Court to suppress all evidence seized from his home and all

statements made on March 2, 2012 [ECF No. 22]. On December 19, 2012, the Magistrate

conducted an evidentiary hearing to receive evidence and testimony on Defendant's Motion to

Suppress.

In his Memorandum and Recommendation, the Magistrate Judge concluded that the

Government did not show exigent circumstances sufficient to justify a warrantless entry to

Defendant's residence. The Magistrate Judge also concluded that the agents did not have consent

when they entered Defendant's house, but that Defendant subsequently consented to a search of

his home. The Magistrate Judge further concluded that Defendant's consent was an independent

act of his free will, and was not a product of the taint of the illegal entry. As well, the Magistrate concluded that Defendant's statements should not be suppressed because they were voluntarily made after Defendant was completely advised of, and had waived, his rights. Accordingly, the Magistrate Judge recommended that Defendant's Motion to Supress be denied. On March 26, 2013, the Court granted Defendant's Motion for Leave to File Objections Out of Time [ECF No. 61], and accepted Defendant's Objections to Report and Recommendations [ECF No. 62] for filing on that date.

In his Objections, Defendant states that the Magistrate Judge correctly concluded that exigent circumstances did not justify the Government's entry into Defendant's home, and that Defendant subsequently consented to a search of his home [ECF No. 62]. However, Defendant contends that the Magistrate Judge erred in concluding that Defendant's after-the-fact consent to a search of his home was an independent act of free will sufficient to purge the taint of the Government's prior Fourth Amendment violation.

The Court conducts a *de novo* review of those portions of a report or specified proposed findings to which timely objection is made. 28 U.S.C. § 636(b); *see also United States v. Lothridge*, 324 F.3d 599, 600 (8th Cir. 2003). As an initial matter, the Court notes that Defendant has not made any objection to the Magistrate Judge's findings of fact, and the Court therefore adopts those facts in their entirety, and incorporates them herein by reference; a summary of the relevant facts will be set out below. The Court considers Defendant's objection to the Magistrate Judge's conclusions and recommendation.

## I. FINDINGS OF FACT

Between February 4 and February 29, 2012, a task force involving U.S. Customs agents, county police, and other officers, acquired information and evidence regarding a woman named

Adrian Renee Bollinger ("Bollinger") that suggested she was involved in criminal drug activity, and that her vehicle, a Nissan Altima, was utilized in such activity.

On March 1, 2012, agents of the Department of Homeland Security Task Force decided to follow Bollinger. That morning, agents, including Agent Joseph Brandt, observed Bollinger as she departed from a Comfort Inn, and traveled to Defendant's home, a single-family residence located at 7115 Florian Drive [ECF no. 41-1 at 6-7]. The agents watched Bollinger back into the driveway. Very shortly thereafter, the agents observed Defendant exit the house, and walk to the passenger side of Bollinger's parked Altima. Defendant opened the front passenger door, and got into the front passenger seat. The agents saw Bollinger and the male bend down underneath the front dashboard of Bollinger's Altima, in an area where the agents had found a hidden compartment during a search of her car conducted on February 4, 2012. The surveillance team observed Bollinger in the car in this position for approximately three to five minutes. Defendant then got out of the car and went back into his house, carrying a grocery bag with him.

Thereafter, Bollinger proceeded to drive away from the house, and the agents followed her. Brandt waited a few seconds before attempting to follow Bollinger [ECF No. 41 at 10]. As he passed Defendant's house, Brandt saw Defendant standing at his front door. Defendant stared at Brandt's vehicle and maintained his stare as Brandt drove by, causing Brandt to believe that Defendant had identified him as a police officer conducting surveillance [ECF No. 41 at 10-11].

A St. Louis County police officer stopped Bollinger after the police officer witnessed her committing a traffic violation. When the agents approached Bollinger and asked for consent to search her vehicle, Bollinger refused. Brandt brought a canine, trained to detect the presence of drugs, to the scene. When walked around the outside of Bollinger's Altima, the canine alerted on the vehicle, indicating the presence of drugs inside. The agents then searched the Altima, and

3

recovered approximately $73,000 in cash from the hidden compartment that had been discovered during the February 4 search of Bollinger's Altima. The search of Bollinger's car was completed shortly after 9:00 a.m. on March 1, 2012.

At approximately 3:00 p.m. that day, five hours after the money was seized from Bollinger's Altima, the agents returned to Defendant's residence. The agents did not conduct any investigation or surveillance concerning Defendant's residence, or any of the occupants of his residence in the interim between the search of Bollinger's Altima and their return to Defendant's premises. Just prior to 3:00 p.m., Agent Chapman of Immigration and Customs Enforcement ("ICE"), informed an intelligence analyst that he and other agents were going to conduct a "knock and talk[1]" at Defendant's residence, and asked for information regarding the premises and its occupants. The analyst informed Chapman that an occupant of the premises had a record for guns and drugs, and an arrest for misdemeanor assault. No law enforcement member present at the location attempted to obtain a photograph of this occupant to determine if it was the individual who entered Bollinger's Altima that morning.

After arriving at Defendant's residence, the agents, including ICE agent Mark Whitson, set up a surveillance of the premises. Within a short time, the agents observed a female exit the residence and approach a vehicle. As the female opened the trunk of the vehicle, County Police Detective Dean O'Hara approached her, and noticed that the female was wearing the uniform of a city corrections officer [ECF No. 41 at 161-63]. O'Hara explained to the female that agents had observed a suspicious transaction take place in the driveway of residence, and asked for her consent to search the home. When the female told O'Hara that the home was owned by her

---

[1]A "knock and talk" is a means law enforcement use to determine whether a resident will allow a search of their premises [ECF NO. 41 at 54-55].

husband, who was taking a shower, and that his consent would be needed, the agents asked her to go get her husband so that they could talk to him. Defendant's wife walked back into the house, and shut the door. The agents waited approximately 30 seconds, then knocked on the door. Defendant's wife opened the door shortly thereafter.

During the approximately forty-seven seconds since Defendant's wife had reentered the home, the agents observed and heard nothing to indicate that anyone inside the house was arming themselves or attempting to destroy evidence. As the agents entered the home, they saw Defendant enter the living room area next to the front door, wearing only a bath towel. The agents directed Defendant to sit on the couch. When Defendant asked if he could get dressed, O'Hara retrieved a pair of sweat pants for him. Two officers conducted a protective sweep of the residence immediately after entry, and observed nothing of value during the sweep.

After the sweep was concluded, O'Hara asked Defendant if he would consent to a search of his house. Defendant did not reply to O'Hara's question; but, after a short period, Defendant asked if he could smoke a cigarette. O'Hara told Defendant that he could smoke if he wanted to do so. As Defendant was finishing his cigarette, O'Hara again discussed the consent to search with Defendant [ECF No. 41 at 170]. When Defendant again failed to answer O'Hara's request for consent, O'Hara told Defendant that either Defendant could consent to the search, or the agents would seek to obtain a warrant for a search of the premises [ECF No. 41 at 171]. A discussion about whether the agents would "tear up" Defendant's house then ensued. After O'Hara assured Defendant that the agents had no intention of tearing up his house, Defendant consented orally to a search.

Before the search was conducted, O'Hara obtained a written consent-to-search form from Agent Chapman. O'Hara explained to Defendant that the form was a consent to search, and he

handed the form to Defendant. O'Hara observed Defendant read over the form, and then sign it on a small table in the living room [ECF No. 41 at 172].

As mentioned above, Defendant objects to that portion of the Magistrate Judge's Report and Recommendations in which the Magistrate Judge concluded that Defendant's after-the-fact consent to a search of his home was an independent act of free will sufficient to purge the taint of a prior Fourth Amendment violation committed by the Government. Defendant and his wife testified before the Magistrate Judge during the December 19, 2012 evidentiary hearing conducted on Defendant's Motion to Suppress [ECF No. 42]. According to Defendant, the agents asked him if they could search his house on four separate occasions, and he refused each time [ECF No. 42 at 35-36, 39-40]. Defendant testified that, on one occasion, the agents told him they would tear up his house and get a search warrant if he did not consent, but that he still refused to allow them to search [ECF No. 42 at 35]. He conceded that he did sign the consent-to-search form, but stated that he believed he was signing an advice-of-rights form [ECF No. 42 at 37-39, 43]. Defendant said that three documents, an advice-of-rights form, a receipt for the items seized from his home, and the consent-to-search form, were given to him [ECF No. 42 at 36-37, 47]. Defendant testified that he read the advice-of-rights form, and that he read the receipt for the items seized sufficiently enough to determine that it was a receipt [ECF No. 42 at 48-50]. Defendant further testified that he signed a form indicating that understood his rights, and that he waived his *Miranda* rights [ECF No. 42 at 48- 49]. Defendant testified that he had completed two years of college, had been advised of his *Miranda* rights on more than two occasions, and had been in legal trouble previously [ECF No. 42 at 44, 48, 51]. Defendant claimed, however, that he did not read the consent-to-search form before he signed it, and that he did not know what the form was when he signed it [ECF No. 42 at 50-51].

6

Agents O'Hara, Chapman, Brandt, and Whitson also testified during the hearing [ECF No. 41]. In his Memorandum and Recommendation [ECF No. 59], the Magistrate Judge, who had the opportunity to view the Defendant and the agents as they testified, accepted the agents', and rejected Defendant's, version of how consent was given and how the form was signed. In making this credibility determination, the Magistrate Judge, noting that the top of consent form was marked in bold letters, "**Consent to Search**," expressly found not credible Defendant's testimony that he read the advice-of-rights form and the receipt for items seized before signing them, but did not read the consent-to-search form before signing it. The Magistrate Judge further explained that he found Defendant's claim not credible because: 1) Defendant said he was interested in not allowing the agents to search; and 2) the agents did not tear up Defendant's house; and 3) the agents did not arrest Defendant on the date of the search.

According to the agents' testimony, Defendant completely cooperated with them during the search of his premises. O'Hara reported that the Defendant never refused consent and never asked the agents to leave. The agents testified that Defendant mulled over his decision of whether to allow the search for the amount of time it took Defendant to smoke a cigarette. O'Hara also stated that he did, in fact, explain to Defendant that they would attempt to obtain a search warrant if Defendant did not consent to a search [ECF No. 41 at 171]. Approximately five minutes after the agents' entry, Defendant consented orally to a search of the residence. Thereafter, Chapman went to his vehicle to retrieve a consent-to-search form. O'Hara testified that Defendant read over the consent-to-search form, before signing it at a little end table near Defendant's chair, and that Defendant signed it in Chapman's presence [ECF No. 41 at 171].

At the top of the form signed by Defendant is the heading, "**CONSENT TO SEARCH**," written in bold, uppercase letters. The first line of the form states: "I,  Ronnie Whisenton  have

been informed by US Immigration and Customs Enforcement (ICE), Special Agent _____

of my right to refuse to consent to a search of my property, described as: <u>residence & contents</u>

<u>& storage locker located at 8440 St. Charles Rock RD Second attic mini storage</u> . . ..

Defendant's circled initials are located to the right of the property description [ECF No. 40-1].

Defendant admits that the form is signed by him. The lines directly above Defendant's

signature state: "I hereby voluntarily and intentionally consent to allow ICE to search my

property. My consent is freely given, and not the result of any promises, threats, coercion, or

other intimidation. **I have read the above statement and understand my rights.**[2]

After Defendant signed the consent-to-search form, the agents conducted a full search of

Defendant's home. The agents seized two firearms, over $100,000 in cash, and other drug

evidence [ECF No. 22-1]. As they searched, Chapman and other agents were aware that the

Defendant's home was heavily surveilled with several video monitoring cameras mounted outside

and inside the residence [ECF Nos. 41 at 238, 42 at 40]. .

While other agents searched the house, O'Hara interviewed Defendant in the kitchen of

Defendant's house [ECF No. 41 at 172-73]. During this interview, O'Hara orally advised

Defendant of his *Miranda*[3] rights. About halfway through the rights, Defendant told O'Hara that

he had dealt with law enforcement authorities in the recent past, and knew his rights; however,

O'Hara, informing Defendant that he still had to inform Defendant fully, continued to explain

Defendant's rights. After stating that he understood his rights, Defendant agreed to discuss his

criminal activity with O'Hara. No threats or promises were made to the Defendant, Defendant

---

[2]The emphasis is in the original form, and this entire section is highlighted by being set apart from the main body of the consent form.

[3]*Miranda v. Arizona*, 384 U.S. 436 (1960).

was calm, cooperative, and cordial throughout the search and interview, and Defendant answered all of O'Hara's questions [ECF No. 41 at 175].

Among other things, Defendant told O'Hara that he had recently been speaking with agents from the Federal Bureau of Investigation ("FBI") regarding some other issues [ECF No. 41 at 174]. He also told O'Hara that the transaction observed by the agents that morning involved him paying Bollinger for some marijuana he had received. Defendant stated that he got Bollinger's "leftovers," ranging from ten to fifty pounds of marijuana, and that he had paid Bollinger between $350,000 and $400,000 over the course of time [ECF No. 41 at 176]. He also told O'Hara that Bollinger had rented a storage facility to use for future transactions and exchanges due to fear caused by a previous interaction during a traffic stop conducted by another agent in O'Hara's group [ECF No. 41 at 177].

During the interview, Defendant's wife was permitted to leave the premises [ECF Nos. 41 at 273-74, 42 at 11]. She left, returning momentarily with Defendant's mother, who was allowed to enter the house several times [ECF Nos. 41 at 235, 42 at 11]. At the mother's request, the agents allowed Defendant's mother to talk with Defendant [ECF No. 41 at 235]. When Defendant's mother told Defendant that he should not be cooperating with the agents, Defendant informed her that he knew what he was doing, and he told her that she could leave [ECF No. 41 at 235]. Defendant's mother even contacted an attorney with her cell phone, and handed the phone to an agent, so that the agent could talk to the attorney [ECF No. 41 at 235]. During this entire period, however, Defendant did not protest the search, and did not revoke his consent to search the premises [ECF No. 41 at 235-36]. At one point, while Defendant was sitting in the kitchen smoking cigarettes and talking to the agents, Defendant stated that he liked Chapman, and

he told Chapman that, if Chapman ever wanted to give up his law enforcement career, he and Defendant could make a lot of money together [ECF No. 41 at 236].

## II. DISCUSSION

In his motion, Defendant asks the Court to suppress as evidence all property seized from his home and all statements made on March 1, 2012, claiming that law enforcement officials entered his home and searched it without a warrant, and in the absence of any recognized exception to the warrant requirement of the Fourth Amendment to the United States Constitution.

As previously discussed, the Magistrate Judge concluded that the Government did not show exigent circumstances to justify a warrantless entry to Defendant's residence. However, the fact that the agents may have entered Defendant's house unlawfully does not conclude the suppression analysis. If Defendant voluntarily consented, and if the evidence was not obtained by exploitation of the illegal entry, then the evidence will not be excluded. *See Kaupp v. Texas*, 538 U.S. 626 (2003). Consent alone is not sufficient to avoid suppression based on an unlawful entry; the Government must also demonstrate that the consent was an independent act of Defendant's free will that purged the taint of the illegal search. *See United States v. Lakoskey*, 462 F.3d 965 (8th Cir. 2006).

When considering whether a consent is sufficient to purge the taint of an illegal search, the Eighth Circuit analyzes four factors: 1) the giving of *Miranda* warnings where applicable; 2) the temporal proximity of the entry and the consent; 2) the presence of intervening circumstances; and 4) the purpose and flagrancy of the official misconduct. *United States v. Greer*, 607 F.3d 559, 564 (8th Cir. 2010).

In his Objections, Defendant states that, even if he validly consented to the search, his consent was not an independent act of free will sufficient to purge the taint of the Government's

10

prior Fourth Amendment violation. Defendant contends that, to reach this conclusion, the Magistrate Judge: 1) relied on a single, fundamentally distinguishable case, *United States v. Greer*, *id.*; 2) misinterpreted the meaning of "purposeful and flagrant"; and 3) overlooked facts important to the "purposeful and flagrant" analysis.

In *Greer*, police officers approached the door of an enclosed porch at the front of Greer's house, after receiving information that a fugitive for whom they possess misdemeanor arrest warrants was inside Greer's house. *Id.* at 562. As they neared the porch, the officers noticed the smell of burnt marijuana. *Id.* The officers knocked on the storm door to the porch, and Greer came out of his house and stepped into the enclosed porch area. *Id.* Greer opened the enclosed porch's solid door. *Id.* The officers then opened the storm door, and entered the porch when Greer stepped back, and they explained that they were looking for a fugitive. *Id.* One of the officers could see the fugitive by looking through the open doorway into Greer's house. *Id.* The officers entered Greer's residence and arrested the fugitive. *Id.* Thereafter, officers secured the residence, by bringing all other occupants into the living room. *Id.* Officers observed a burnt marijuana cigarette in an ashtray. *Id.*

The officers informed Greer that they smelled marijuana, and asked Greer for consent to search the residence. *Id.* After Greer spoke to his brother, who arrived shortly after the officers entered Greer's home, Greer asked if the officers would seek a search warrant if he withheld consent. *Id.* When informed that they would, Greer orally consented to a search of his house, and subsequently signed two consent forms, because his first consent was misplaced. *Id.* The officers seized a revolver, ammunition, hydrocodone pills, some correspondence, and a money order payable to Greer. *Id.*

Prior to his jury trial, Greer filed a motion to suppress evidence, arguing that police officers violated the Fourth Amendment when they entered the porch, and then his house. *Id.* The Court concluded the porch entry was not unconstitutional, finding that Greer impliedly invited the officers to enter when he opened the porch door and stepped back. *Id.* at 563. The Eighth Circuit found the house entry problematic, noting that the Government did not contend that Greer consented to the officers moving from the porch to the house, that exigent circumstances justified the entry, or that the fugitive resided in the house. *Id.* The Court found that Greer's consent, orally and in writing, was voluntary, but acknowledged that voluntary consent, without more, was not sufficient to avoid suppression of evidence based on the unlawful entry. *Id.* The Court then considered whether the evidence was obtained by "means sufficiently distinguishable to be purged of the primary taint," rather than exploitation of the illegal entry, such that it should not be excluded. *Id.* at 564. In making its exclusion determination, the Court considered the giving of *Miranda* warnings, the "temporal proximity" of the entry and the consent, "the presence of intervening circumstances, and particularly, the purpose and flagrancy of the official misconduct." *Id.* It found that the purpose of the unlawful entry was not to investigate Greer, but to apprehend the fugitive spotted in the residence; that the entry was not especially flagrant as the residence's door was open and no force was used to gain access; and, noting that the officers smelled marijuana before entering the house, that the unlawful entry did not prompt the request to search. *Id.* The Court acknowledged the brief lapse of time between the entry and Greer's consent, but found important intervening circumstances occurred, including the arrival of Greer's brother on the scene. *id.* The Court found that, although he had several opportunities to pause and reflect, decline consent, or revoke consent, Greer granted permission to search and never withdrew his consent. The Court concluded that the circumstances of the

search of Greer's home demonstrated purgation of the taint and that Greer's voluntary consent was an independent act of free will. *Id.* It held that the district court did not err in denying Greer's motion to suppress. *Id.*

In arguing that the facts of *Greer* "are fundamentally distinguishable" from the facts presented here, Defendant emphasizes that the Government's unlawful entry in *Greer* was not to investigate Greer, but to apprehend a fugitive spotted in the residence. *Id.* at 562. Defendant argues that the facts of his case are entirely different from those in *Greer*, because the Government approached and entered Defendant's home for entirely investigative purposes. Defendant contends this distinction makes a difference because unlawful government action motivated by investigatory purposes demonstrates a quality of purposefulness. Defendant also contends that the Magistrate Judge suggested that the misconduct did not rise to the level of purposeful and flagrant because the agents did not force their way into Defendant's home and the atmosphere after their entry was not "wrought with tension or hostility." He further claims the Magistrate Judge overlooked facts that suggested the circumstances of the search "were not as congenial as the report suggests[,]" noting that the agents entered with guns drawn and directed the towel-clad defendant to sit in his living room under the watch of several officers, that Defendant had to disrobe and dress in their presence, and that he was illegally detained during the duration of the unlawful protective sweep of his home.

As an initial matter, the Court again notes that Defendant made no objection to the Magistrate Judge's findings of fact, or the credibility determinations made concerning the hearing testimony, including the Magistrate Judge's acceptance of the agents' version of how consent was given and the form signed, and his rejection of Defendant's testimony regarding the signing of the consent form. The Court likewise finds not credible Defendant's assertion that he read the

13

advice-of-rights form, and the receipt for items seized, but did not read the consent-to-search form, before or after admittedly signed it. Defendant, a thirty-three-year-old college-educated individual with prior experience in dealing with law enforcement officials, questioned the agents concerning how they intended to conduct the search, and considered O'Hara's request over a period of time in which he dressed, and slowly smoked an entire cigarette. According to Defendant's own testimony, he was sophisticated enough to know to remove any potential contraband from his house if he were aware of police presence in his area [ECF No. 42 at 30]. In fact, Defendant's savvy, and familiarity with law enforcement protocol and procedure, is evident from his hearing testimony. Defendant has been advised of his *Miranda* rights on several prior occasions, has been represented by his present counsel for a long time, and has previously been represented by counsel. After being assured that the agents had no intention of tearing up his house, and being told that the agents would seek a warrant if he did not give them permission to search, Defendant consented orally and in writing. Defendant was observed reading and signing the form, which was marked, in bold, uppercase letters at the top of the form, "**CONSENT TO SEARCH**."

During his entire encounter with the agents that day, Defendant was calm, cooperative, and cordial, and no threats or promises were made to Defendant. Immediately after Defendant consented, O'Hara informed Defendant of his *Miranda* rights, while Defendant smoked another cigarette. When Defendant told O'Hara that he had been through the process before, had recently spoken with FBI agents regarding other issues, and was aware of his *Miranda* rights, O'Hara continued to explain them fully. Defendant stated orally, and in writing, that he understood and waived his *Miranda* rights, and he answered O'Hara's questions.

Intervening circumstances were present between the Government's entry and Defendant's consent. Defendant's wife was permitted to leave the premises, and she returned "momentarily" with Defendant's mother. Defendant had several opportunities to pause and reflect, decline consent, or revoke consent. Significantly, despite the arrival of Defendant's mother on the scene, her warning to him regarding cooperation, and her telephone contact with Defendant's attorney, Defendant, like the defendant in *Greer*, never withdrew his consent. Instead, the Defendant informed his mother that he knew what he was doing, and told her that she could leave.

As to the "purpose and flagrancy" of the Government's misconduct here, although the consent to search did involve one of the reasons for the entry, the evidence shows that the circumstances of the agents' entry and their search were not particularly aggravated. There was no forced or violent entry, no threats or promises were made to Defendant, at no time was Defendant handcuffed, and the credible evidence reveals the interaction was cooperative and calm. In fact, the hearing testimony found credible by the Magistrate Judge reveals that the atmosphere was not particularly intimidating or coercive, as Defendant remained cordial throughout the encounter, and even joked with Chapman about making lots of money together. The Court concludes that, under the totality of the circumstances, Defendant's consent was given voluntarily, and was an independent act of free will, sufficient to purge any taint arising from the Government's prior Fourth Amendment violation. *See Schneckloth v. Bustamonte*, 412 U.S. 218 (1977).

Concerning the statements made by Defendant on March 2, 2012, the Court finds that Defendant's statements were voluntarily made after Defendant was completely advised of, and had waived, his *Miranda* rights. The Court concludes Defendant's statement should not be

suppressed. The Court will deny Defendant's Motion to Suppress Evidence and Statements [ECF No. 22].

Accordingly,

**IT IS HEREBY ORDERED** that Defendant Ronnie Whistenton's Motion to Suppress Evidence and Statement [ECF No. 22], is **DENIED**.

So Ordered this 5th day of April, 2013.

E. RICHARD WEBBER
SENIOR UNITED STATES DISTRICT JUDGE